```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
                       CASE NO. 12-20291-CR


 UNITED STATES,                    Miami, Florida

        PLAINTIFF,                 October 9, 2015

    vs.                            8:59 a.m. to 9:27 a.m.

 ARMANDO GONZALEZ,                 Courtroom 12-2

        DEFENDANT.                 (Pages 1 to 20)
```

---

```
                         RULE 35 HEARING
           BEFORE THE HONORABLE CECILIA M. ALTONAGA,
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

 FOR THE GOVERNMENT:    ALLAN J. MEDINA, ESQ.
                        Assistant United States Attorney
                        United States Department of Justice
                        950 Pennsylvania Avenue, Northwest
                        Washington, D.C. 20530-0001
                        (202) 257-6537
                        allan.medina@usdoj.gov

 FOR THE DEFENDANT:     JOAQUIN G. PEREZ, ESQ.
                        6780 Coral Way
                        Suite 200
                        Miami, Florida 33155
                        (305) 261-4000
                        Jplaw1@bellsouth.net


 REPORTED BY:           STEPHANIE A. McCARN, RPR
                        Official Court Reporter
                        400 North Miami Avenue
                        Twelfth Floor
                        Miami, Florida 33128
                        (305) 523-5518
                        Stephanie_McCarn@flsd.uscourts.gov
```

```
 1                            I N D E X

 2                             WITNESSES

 3
     WITNESSES FOR THE GOVERNMENT:                         Page
 4                                                          --

 5

 6
     WITNESSES FOR THE DEFENDANT:                          Page
 7                                                          --

 8

 9   EXHIBITS MARKED & ADMITTED IN EVIDENCE   MARKED    ADMITTED

10   Government Exhibit No.                     --         --

11   Defendant's Exhibit No.                    --         --

12

13

14

15

16

17                          MISCELLANEOUS

18                                                         Page
     Proceedings.........................................    3
19   Court Reporter's Certificate.......................    20

20

21

22

23

24

25
```

1           (The following proceedings were held at 8:59 a.m.)
2               THE COURT:  Good morning.  Please be seated.  United
3    States and Armando Gonzalez.  Counsel, please state your
4    appearances.
5               MR. MEDINA:  Good morning, Your Honor.  Allan Medina
6    on behalf of the United States.
7               MR. PEREZ:  Good morning, Your Honor.  Joaquin Perez
8    on behalf of Armando Gonzalez, who is present in court.
9               THE COURT:  Okay.  We are here on a motion for
10   sentence reduction filed by the government.
11              I will hear from you, Mr. Medina.
12              MR. MEDINA:  Thank you, Your Honor.  Your Honor, the
13   government is recommending a 37 percent reduction based on
14   Mr. Gonzalez's substantial assistance in the investigation
15   involving Healthcare Solutions Network.  Based on that
16   37 percent reduction, the sentence would be approximately
17   106 months, taking that reduction from 168 months Your Honor
18   sentenced Mr. Gonzalez to originally.
19              If I may just break down the nature of Mr. Gonzalez's
20   cooperation.  First, following his arrest in May 2012,
21   Mr. Gonzalez began cooperating with the government in the sense
22   of meeting for debriefings in November of 2012.  He accepted
23   responsibility.  He described his role in this $63 million
24   fraud scheme and the role of others.  More significant, Your
25   Honor, at that time, he turned over voluntarily significant

|   |   |
|---|---|
| 1 | Healthcare Solutions Network business records to include |
| 2 | patient files, census reports and other business records that |
| 3 | were later used in prosecutions of additional defendants in |
| 4 | this particular fraud scheme. |
| 5 | As a result of this cooperation, the government has |
| 6 | indicted or charged in various different ways approximately |
| 7 | 14 defendants, including in January 20 -- on January 29, 2013, |
| 8 | there was a superseding indictment in this case, |
| 9 | Case No. 12-CR-20291. And in that case, we charged Alina Feas, |
| 10 | Lisset Palmaro, Dana Gonzalez, and Gema Pampin, all who pled |
| 11 | and did not go to trial. |
| 12 | In addition, on June 30th, 2014, Francisco Pabon was |
| 13 | charged by way of information. He was an intake |
| 14 | coordinator/social worker at Jackson Hospital here in Miami. |
| 15 | And from information Armando Gonzalez provided to us, along |
| 16 | with other coconspirators, we learned that Francisco Pabon in |
| 17 | the parking lot of Jackson South Hospital received kickbacks, |
| 18 | cash kickbacks from Armando Gonzalez in exchange for foreign |
| 19 | patients who were recently discharged from Jackson South |
| 20 | Hospital who ultimately made their way to Healthcare Solutions |
| 21 | Network. Mr. Pabon pled guilty. |
| 22 | And finally, on July 11, 2013, a seven-person |
| 23 | indictment was brought before Judge Scola, |
| 24 | Case No. 13-CR-20505. And in that case, therapists were |
| 25 | indicted along with the medical director, the psychiatrist for |

1  Healthcare Solutions Network, Dr. Roger Rousseau.
2              In addition to the information provided that led to
3  these additional indictments and informations, Armando Gonzalez
4  testified one time, and that was in the case *United States v.*
5  *Roger Rousseau,* 13-CR-20505.  As a result of his testimony, as
6  well as testimony of some other coconspirators, Dr. Roger
7  Rousseau was convicted on all counts along with the therapists
8  that were brought to trial before Judge Scola.  And sentencing
9  in that case is scheduled for the end of November, Your Honor.
10             Based on that substantial assistance, based on the
11 defenses that were charged, the records that were turned over
12 and his trial testimony, the government is recommending a
13 37 percent reduction.
14             If I may briefly, the defendant filed yesterday Docket
15 Entry 656, motion in support of a sentence reduction.  At
16 Footnote 1, the defendant mentions the reductions that were
17 brought before, Your Honor, for Gema Pampin, Dana Gonzalez,
18 Alexandra Haynes and Serena Joslin.  In those instances, the
19 government recommended 40 percent reductions except for Gema
20 Pampin who received a 45 percent reduction.  And I just wanted
21 to point out the slight difference between those defendants and
22 Mr. Gonzalez.
23             With respect to Gema Pampin, the main differences in
24 that case is that Ms. Pampin, though indicted after
25 Mr. Gonzalez, started cooperating before she was charged in

1  that particular case.  In addition, Ms. Pampin testified three
2  times in the case *United States v. Wondera Eason* before Your
3  Honor and also in the initial Roger Rousseau trial and the
4  second retrial for Roger Rousseau.
5         Dana Gonzalez also testified three times, not only in
6  Healthcare Solutions Network Roger Rousseau trials, but also in
7  a separate trial involving American Therapeutic Corporation, a
8  $200 million fraud scheme down here in Miami.
9         As a result of her testimony and the testimony of
10 others, each of the defendants in both cases were convicted at
11 trial.
12        Finally, with respect to Ms. Haynes, she testified two
13 times and that was in the Wondera Eason trial, along with the
14 Roger Rousseau trial brought before Judge Scola.
15        And with respect to Ms. Joslin, who received a
16 40 percent reduction, she testified one time, but like
17 Ms. Pampin, also started meeting with the government
18 pre-indictment and she was brought in in the initial indictment
19 before Your Honor in May 2012.
20        So as a result of the substantial assistance, the
21 comparisons with these other defendants, the government is
22 recommending a 37 percent reduction, which ultimately would
23 lead to a final sentence of 106 months in prison.
24        THE COURT:  Thank you.
25        Mr. Perez?

1        MR. PEREZ:  Thank you.
2        Did the -- may I approach?  Did the Court receive the
3   sentencing memorandum?
4        THE COURT:  I did.  Thank you.
5        MR. PEREZ:  At that sentencing, the Court expressed
6   more reservations about somebody like Mr. Gonzalez because of
7   his background and his involvement in the case.  And rightfully
8   you felt that the defendant should be sentenced at the high end
9   of the sentencing guidelines, which is a significant difference
10  between this defendant and the other defendants who got a
11  reduction in this case.  The defendant started from the high
12  end of the guidelines.
13       THE COURT:  I'm sorry.  You say it is a difference
14  because Mr. Gonzalez started at the high end of the guidelines
15  and the other defendants did not?
16       MR. PEREZ:  Well, the other defendants, when they
17  received the sentence reduction, they received it from the low
18  end of the sentencing guidelines.  Although I understand why
19  the Court imposed a high-end sentence.  If you look at the
20  transcript of what happened three years ago, which I hope the
21  Court has reviewed, at that time the defendant had already
22  begun to cooperate and the government insisted upon a low-end
23  sentence taking into account the fact that he had already begun
24  to cooperate and it was going to be factored into the equation.
25  And when the Court asked the government, Why are you doing

1  this, they took the position that it was because of the
2  cooperation that he had provided.
3        I only mention that because that -- and then I asked
4  the Court to postpone the sentencing and the Court rightfully
5  said, you know, Issues that have to do with mitigation of
6  sentence are matters that I take exclusively based upon the
7  cooperation of the defendant as provided.
8        So today we are not here on the question of -- I
9  guess, for lack of a better word -- the personal
10 characteristics of the defendant.  We are here on the extent
11 and value of the cooperation that he has provided.  And I would
12 suggest to the Court that the extent and value of the
13 cooperation that he provided exceeded the ones for -- of the
14 other defendants that received a 40 or a 45 percent reduction.
15 He began to cooperate from the beginning.  And it is
16 significant to say that all the records that were then used in
17 order to indict additional 14 defendants were provided by this
18 defendant.
19       But for those records, I think the prosecution -- I
20 think they acknowledge that -- would have had a difficult time
21 superseding the indictment and returning the charges that were
22 ultimately filed against several defendants and Dr. Rousseau.
23       And if I may refer to the -- to the transcript of the
24 February 25th, 2013, sentencing hearing, the Court is
25 specifically -- well, the prosecutor specifically says that

1  they were struggling with the recommendation that they were
2  making but they recognize that -- they recognize, and this was
3  at the time in which the Court was concerned about sentencing,
4  was not concerned about cooperation.
5          This is some page -- page 3 of the transcript.  I
6  don't know if the Court has it in front of you.
7          THE COURT:  I do not, no.
8          MR. PEREZ:  Do not?
9          THE COURT:  I mean, I can pull it up.
10         MR. PEREZ:  No, no, no.  Here.  It was attached to my
11 sentencing memorandum.
12         THE COURT:  Right.  What page?
13         MR. PEREZ:  Page 3.
14         THE COURT:  Yes.
15         MR. PEREZ:  We will start with -- it will be line 16
16 through 19.  And I think it's important.  Because of his
17 cooperation, the government was able to locate thousands of
18 documents stored in Miami related to the healthcare fraud
19 conspiracy both in Miami and North Carolina.
20         In addition, the defendant has provided the
21 information that led to the return of indictments and also to
22 the -- some of the subsequent charges that were charged against
23 other individuals.
24         Now, when the Court asked the government whether in
25 fact -- the Court at that time indicated that you were so

concerned about the recommendation that was being made for the low end of the sentencing guidelines, and I think that it is worth noting, as I mentioned in my sentence memorandum, that the government stood by the recommendation indicating the following:

The government entered into a plea agreement in this case. Part of the reason, as the Court is well aware, is that the plea agreement is used to provide certainty of the sentencing process.

And then the government is well aware of Mr. Gonzalez's conduct, the severity of it and the impact that it had on the community and the Medicare system. That being said, he has provided significant cooperation up to date, and I expect the cooperation to continue, which indeed it did continue.

But the government is recommending, and this is after the Court expressed concerns about the recommendation by the government -- the government is recommending that he be sentenced within parameters of the plea agreement which was the low end of the plea agreement.

Now, why do I mention that? I think that all of that cooperation should be taken into consideration now regarding what should be the sentence reduction. I know that the government has made a recommendation but the Court ultimately makes a decision as to what is an appropriate sentence

1  reduction.

2  And now, I guess to a certain degree, and not to -- we
3  have to set aside what we think about Mr. Gonzalez and think
4  about the extent and value of his cooperation. I mean, you
5  have really sentencing at the higher end of the guidelines.
6  Now, what I ask the Court is to at least reduce the sentence by
7  50 percent or at least by 45 percent, which is the sentence
8  that was recommended and the Court granted regarding a
9  codefendant in the case.

10  Now, the -- the government may argue that Mrs. Pampin
11  was a low-end defendant. Yeah, she was a low-end defendant.
12  She didn't get any enhancement. This defendant got
13  enhancements because of his managerial leadership role and
14  that's the reason why he got 168 months.

15  All I am asking the Court to do is to take all of this
16  into account because specifically I remember -- it's in the
17  transcript -- I asked the Court to take into account the
18  recommendation and cooperation that he had provided. And the
19  Court's responses, those are matters to be taken up in the
20  future. I am not concerned right now with the cooperation that
21  he provided. Obviously, the government felt that the
22  cooperation that he had provided at the time was worth the
23  Court sentencing at the low end of a sentencing guideline.

24  Because of that, I will ask that the government's
25  recommendation be exceeded, that he be sentenced at least in

1  the manner which is consistent with the other defendants in the
2  case, and therefore if I -- my math is right, if you reduce the
3  sentence by 40 percent, he will get a 67-month reduction and
4  then the sentence will be 101-month.  If you reduce it by -- if
5  you reduce it by 50 percent, the sentence will be 84 months.
6         I think that certainly this is one time that the Court
7  should exceed the recommendation made by the government in this
8  case.
9         THE COURT:  Thank you.
10         MR. PEREZ:  Yeah.
11         THE COURT:  Except that Mr. Medina has explained the
12  significantly greater cooperation provided by these other
13  lower-level participants in this conspiracy.  You are asking me
14  to reward Mr. Gonzalez at a greater extent than Ms. Pampin.
15         MR. PEREZ:  She got a 45 percent reduction.  I wish
16  to -- she got a 45 percent reduction.
17         But the other -- part of the reason why I think that I
18  disagree with my friend Mr. Medina, who is an excellent
19  attorney, is that there are many times in which defendants
20  plead guilty because they know that somebody is about to
21  testify against them.
22         And as shown by this transcript, Mr. Layman and Ms. --
23  I think at least Mr. Layman, and Mr. Thorn, I think, was the
24  other defendant, to a certain degree, pled guilty because they
25  knew that Mr. Gonzalez was going to be a witness against them.

1    And in addition to that, all the other 14 defendants
2    who ultimately pled guilty, some of whom pled guilty without
3    going to trial, knew that Mr. Gonzalez was going to be a
4    witness against them.
5        So when you take into account -- it's not so much the
6    number of trials that a person is a witness in.  Indeed, what I
7    think is more relevant is the significance of the cooperation.
8    I guess Mr. Medina will agree with the assessment that was made
9    two or three years ago that the records that were provided were
10   essential in order to return an indictment against the other
11   people who were subsequently indicted.
12       At a personal level, since the Court is asking about
13   the 45 percent, one of the most difficult decisions that
14   Mr. Gonzalez was called to make was testifying against
15   Dr. Rousseau.  And let me tell the Court why it was a difficult
16   decision.
17       Dr. Rousseau had many faults but Dr. Rousseau was the
18   one who took care of his family and his kids.
19       I think it was very painful for Mr. Gonzalez to take
20   the witness stand against somebody who had, in fact, taken care
21   of his children, and I think that that was a personal decision,
22   Mr. Medina would probably agree with that, that was reflected
23   when he testified at trial.  And because of that personal
24   struggle, it's, I think, that to a certain degree, the jury
25   took into account the fact that he was there telling the truth

1  but it was very painful for him to do that.  Because in telling
2  the truth about Dr. Rousseau, he was implicating somebody that
3  he felt had been helpful to his family.
4        In fact, I think the last question that was asked of
5  him on cross-examination was, How dare you testify -- or words
6  to that effect, that's what I -- was relate, as Mr. Medina
7  would say.  How dare you testify against a person that was so
8  good to your family that took care of your kids that provided
9  medication and provided guidance to your kids.  And I think
10 Mr. Gonzalez's response was, I'm here to tell the truth, as
11 painful as that may be.
12       Mr. Medina was there.  I wasn't there.  It was
13 information that was relayed to me by some of the other
14 attorneys.
15       That is the type of painful decision that oftentimes
16 makes a difference in the trial.  And I think that it's also a
17 type of decision -- in my sentencing memorandum, I quoted a
18 very old case that -- but it's Supreme Court of the United
19 States.  It's a 1980 case.  It's on page 2.  In fact, I was
20 surprised in -- to find this case because it was before the
21 guidelines and it's before the mandatories.
22       And the Court has said that -- for what it's worth, it
23 said cooperation is an obligation of community life that
24 could/should be recognized before rehabilitation can begin.
25       By his willingness to cooperate against his partners

1    in crime, this is the -- Mr. Gonzalez severed all connections
2    with people like Dr. Rousseau.
3           And then this is the quote from the Supreme Court, I
4    frankly was unaware of, indicating that few facts are available
5    to a sentencing judge that are more relevant to a defendant
6    likelihood that he will transgress no more and the hope that he
7    may respond to rehabilitative efforts and to assist law
8    enforcement, and by doing so, he declares that he is no longer
9    at war with society.
10          I think that his testimony -- and I will ask
11   Mr. Medina to really affirm this -- against Dr. Rousseau and
12   the way that it was described to me was very significant in
13   convicting a person who was at the -- certainly agree, that
14   made this crime possible, this psychiatrist.
15          So with that in mind, I really will say that I agree
16   with Mr. Medina's assessment about the cooperation was very
17   significant but I disagree about the fact that you need to take
18   into account the fact that somebody testified in three trials,
19   vis-a-vis one trial.  Many people pled guilty because they knew
20   that Armando Gonzalez would be a witness against them.
21          I don't know if Mr. Medina -- he was there, but I do
22   remember this because I -- it was relayed to me and I know how
23   painful it was for Mr. Gonzalez to be a witness against
24   Dr. Rousseau.
25          THE COURT:  Thank you.

```
 1             Mr. Medina.
 2             MR. MEDINA:  Yes, Your Honor.  I'll just -- with
 3   respect to Mr. Gonzalez's testimony and -- in the Rousseau
 4   trial, in fact, so -- with Roger Rousseau, there were two
 5   trials.  He testified in one.  Many decisions, many choices --
 6             THE COURT:  Why not in the other?
 7             MR. MEDINA:  Well, just not prepared, not ready to
 8   testify in that particular case.
 9             THE COURT:  Was that the first time or the second
10   trial?
11             MR. MEDINA:  That was the first trial, which led to
12   the --
13             THE COURT:  The hung jury?
14             MR. MEDINA:  -- hung jury.  And we later called
15   Mr. Gonzalez in the second trial as a result of the impact his
16   testimony did have, as Roger Rousseau was his partner since day
17   one at Healthcare Solutions Network.
18             THE COURT:  So why wasn't he ready to testify in the
19   first trial?  What readiness was there to be had?
20             MR. MEDINA:  It was issues related to prior conduct
21   that --
22             THE COURT:  Whose prior conduct?
23             MR. MEDINA:  Mr. Gonzalez's prior conduct.  There was
24   a home health agency that he had that we'd never covered before
25   and when we asked him about it, it was several days before the
```

1  trial and we learned that it was part of a separate fraud, a
2  minor fraud nonetheless, but he did admit it to us immediately,
3  and we just thought because of the timing, we weren't prepared
4  to move forward at that time in the first trial with
5  Dr. Rousseau.
6          And that was the reason, that was the choice that the
7  government made.  And because of that, I don't know how that
8  testimony would have shaped out in the first trial, but we then
9  called him in the second trial and it was a conviction on all
10 counts.
11         So we took all of that into consideration, the files
12 that were turned over, the testimony, the first -- the Roger
13 Rousseau trial, the 14 defendants, and with that, my thought,
14 my authorization was for the 37 percent reduction.  We think
15 that is reasonable in light of the cooperation today and prior
16 to being charged.
17         THE COURT:  Thank you.
18         Mr. Perez, anything additional?
19         MR. PEREZ:  No, I wasn't there, but I wanted to hear
20 from Mr. Medina about whether in fact it was true that the last
21 question that was asked of Mr. Gonzalez is, How dare you do
22 this against somebody that was so good to your family.
23         I was just curious.
24         MR. MEDINA:  That is accurate.  Paraphrased, I don't
25 know exactly, but it was -- at trial, did come out.  It was

1  difficult and he did, you know, have to tell the truth under
2  his plea agreement and under obligations.
3           THE COURT:  Has the cooperation included locating
4  assets and money to reimburse the government?
5           MR. MEDINA:  Yes, Your Honor.  As part of his plea
6  agreement, he had entered into a money judgment and also turned
7  over real properties.  I believe it was his home in North
8  Carolina as well as the North Carolina Healthcare Solutions
9  facility.  At the time, the Miami facilities were shut down.
10 So again, as a result of his plea agreement, he agreed to
11 forfeit those assets.
12          MR. PEREZ:  And I think he also divested himself of a
13 million -- this was before I came into the case.  It was some
14 money that had been seized on an account and he released that
15 when I became involved in the case.
16          MR. MEDINA:  I apologize, Your Honor.  It was in the
17 800- to $900,000 range, which was significant.
18          THE COURT:  I have carefully reviewed the government's
19 motion for downward departure and the defendant's motion in
20 support of sentence reduction, given careful consideration to
21 the descriptions of the defendant's cooperation furnished here
22 in open court by counsel for the parties.  I will be granting
23 the motion for downward departure reducing Mr. Gonzalez's
24 sentence from 168 months to 121 months in recognition of the
25 cooperation and as compared to the cooperation provided by

1 others.
2         Is there anything additional?
3         MR. MEDINA:  Nothing from the government, Your Honor.
4         MR. PEREZ:  I -- so the Court is not -- is not abiding
5 by the recommendation made by the government?  I think that if
6 they --
7         THE COURT:  It's a recommendation, Mr. Perez.
8         MR. PEREZ:  Okay.  So --
9         THE COURT:  Is it not?
10        MR. PEREZ:  No, I understand.  All I wanted to know is
11 I wanted to make sure that I heard right.
12        THE COURT:  That my math is correct?  Yes, that I am
13 reducing his sentence not by the government's proposed
14 37 percent or your proposed 50 percent but by 28 percent.
15        You all have a good day.
16        MR. MEDINA:  Thank you, Your Honor.
17    (The proceedings concluded at 9:27 a.m..)
18
19
20
21
22
23
24
25

```
 1                    C E R T I F I C A T E

 2
          I hereby certify that the foregoing is an
 3
    accurate transcription of the proceedings in the
 4
    above-entitled matter.
 5

 6

 7   _01/22/16_        [signature: Stephanie A. McCarn]
         DATE          STEPHANIE A. McCARN, RPR
 8                     Official United States Court Reporter
                       400 North Miami Avenue, Twelfth Floor
 9                     Miami, Florida 33128
                       (305) 523-5518
10
```